IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE

---

| | | |
|---|---|---|
| IN THE MATTERS OF | ) | |
| | ) | |
| W.H., | ) | |
| A minor Student, | ) | |
| By and Through His Parents, | ) | |
| M.H. and D.R.; | ) | |
| | ) | |
| J.A, | ) | |
| A minor Student, | ) | |
| By and Through His Parents, | ) | No. 3:15-cv-01014 |
| S.A and M.A.; | ) | |
| | ) | |
| J.B.., | ) | |
| A minor Student, | ) | |
| By and Through His Parents, | ) | |
| J.B. and S.B.; | ) | |
| | ) | |
| Plaintiffs. | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| EDUCATION | ) | |
| and | ) | |
| | ) | |
| KNOX COUNTY SCHOOLS | ) | |
| | ) | |
| Defendants | ) | |

---

### FIRST AMENDED COMPLAINT

---

1

COMES NOW, THE PLAINTIFFS, W.H., J.A, and J.B., by and through their respective parents, M.H. and D.R., S.A. and M.A, and J.B. and S.B. They respectfully show:

## I. PARTIES, JURISDICTION, VENUE

1. W.H. is minor child who attends elementary school at Rocky Hill Elementary in Knoxville, Tennessee. He and his parents reside at 1512 Aldenwood Ln, Knoxville, TN 37919.

2. J.A. is a minor child who attends Ball Camp Elementary school in Knoxville, Tennessee. He and his parents reside at 8529 Richland Colony Road, Knoxville, Tennessee 37923.

3. J.B. is a minor child who attends pre-school at Brickey-McCloud Elementary school in Knoxville, Tennessee. He and his parents reside at 1935 Meadow Stone Lane, Knoxville, Tennessee 37938.

4. The Tennessee Department of Education is the "State Education Agency" (SEA) which is legally responsible for ensuring that a free appropriate education (FAPE) is provided to all students in the state of Tennessee. An "SEA" includes a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, township, school district, or other political subdivision of a State [.]" 20 U.S.C. §1412(a)(1).

5. Knox County Schools is a governmental subdivision of the State of Tennessee, duly authorized to administer public schools within Knox County. It

receives federal financial assistance and is a public entity as defined in Title II of the Americans with Disabilities Act, and is obligated under Federal and Tennessee law to comply with special education laws, which include identifying students eligible for special education, providing notices of procedural safeguards, and providing them with a free and appropriate public education.

6. TDOE and KCS accept federal funding. TDOE and KCS are bound by the IDEA, by Section 504, and by Title II of the Americans with Disabilities Act.

7. This is a Complaint arising from systemic issues under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1415(e)(2), and its state counterpart, Tenn Comp. R. & Reg § 0520-01-09; Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

8. Venue is proper under 28 U.S.C. §1391 because TDOE is the State Education Agency (SEA) which is located in Nashville, Tennessee; funding issues are addressed in Nashville; policy on educational funding is derived from Nashville; Knox County Schools applies to TDOE for its funding in Nashville; and the Plaintiffs are subject to such funding and policy emanating from Nashville.

## II. INTRODUCTION

9. This lawsuit concerns much-needed educational reform on the issue of "least restrictive environment." It concerns long failures by KCS to adhere to principles of "least restrictive environment" for children with pervasive disabilities like developmental delay, autism, intellectual disability, other health impairment, or

3

multiple disabilities (but not specific learning disability). Culturally and for funding reasons, KCS utilizes more restrictive environments without adequately considering supplemental aids, services and supports. TDOE sends mixed messages to schools: On the one hand, it publicly endorses "least restrictive environments," but on the other, its funding mechanisms encourage more restrictive environments. By law, **"special classes, separate schooling, or other removal of handicapped children from regular educational"** are to be avoided to the maximum extent possible. As demonstrated, KCS is placing children such as W.H., J.A., and J.B., from an early age, in more segregated settings than necessary, often in highly segregated "separate" schools known as "Comprehensive Development Classes" (CDC).

10. When a child with a pervasive disability like W.H., J.B., or J.A. needs supports, which include, but are not limited to, a <u>classroom aide</u>, <u>itinerant instruction</u>, or <u>Resource Room</u> *in conjunction with general education*, he is instead typically funneled into a "special class, separate schooling, or other removal" due to historical preference as well as funding reasons. Being a systemic and ongoing issue, administrative exhaustion through due process hearing(s) is neither required nor appropriate.

11. As explained more fully below, TDOE's "resource-based" funding options are the inverse of what is required by the Individuals with Disabilities Education Act, Section 504 and Title II of the ADA. TDOE gives more money to the local school when the student is placed in a more restrictive environment. Therefore, when

4

Supplemental Aids Supports and Services like a classroom aide, itinerant instruction, or Resource Room is needed *to supplement general education*, KCS instead defaults to a more restrictive option of separate classroom in order to obtain more money.

12. Because TDOE and KCS are accepting federal funds premised upon creation of *least* restrictive environments, not *more* restrictive ones, this action is necessary. W.H., J.B., and J.A. and many persons like them with a pervasive disability, could have participated in regular general education with appropriate supplemental aids, supports, and services. However, flawed funding formulas, IEP-creation barriers, and bias in favor of more restrictive environments have prevented this.

### III.   FACTS

#### A.   Background and Context:  Least Restrictive Imperative Is Grounded in Law

13. School systems must ensure that … "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." 34 C.F.R. §300.552(c). So, for example, school districts may not unnecessarily restrict a child *if* that child's IEP can be implemented using supplementary aids and services in a regular education classroom in the student's neighborhood school.

14. Additionally, the United States Department of Education's Office of Special Education and Rehabilitative Services (OSEP) has confirmed that least restrictive environment applies to the placement of preschool children with disabilities.

5

13. *Through* the vehicle of "Supplemental Aids and Services," disabled children are to be brought *into* the regular education classroom "to the maximum extent possible."[1] The law provides:

> Supplementary aids and services. *Supplementary aids and services* means aids, services, and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, **to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with §§ 300.114 through 300.116.**

34 C.F.R. § 300.42; *accord*, 20 U.S.C. §1401(33) (emphasis added).

14. As the above language reflects, "the maximum extent appropriate" is defined by reference to the effectiveness, or lack thereof, of Supplementary Aids and Services. It is only when Supplementary Aids and Services are *not effective* in the regular education classroom that a school district can consider an alternative and more restrictive placement.

15. Parents and local education authorities (LEAs) are instructed to collaborate and create an Individual Education Plan for children with a disability. Importantly, though, the regulations concerning the IEP are heavily muscled with the expectation of the regular education classroom, or, in the parlance specific to preschoolers, "Regular Early Childhood Program." 20 U.S.C. §1414(d). For example, every IEP must contain a written statement of "special education and related services and supplementary aids and services, *based upon peer reviewed research to the extent practicable*, to be provided to the child, or on behalf of the

---

[1] "Maximum extent appropriate" is the language which gives rise to terms such as "least restrictive environment," "mainstreaming," or "inclusion."

child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . **to be involved in and make progress in the general education curriculum in accordance with paragraph (a)(1) of this section.**" (34 C.F.R. §300.320(a)(4)(ii) (emphasis added).

16. Importantly, the IEP team must also "[m]ake provision for supplementary services (such as resource room or itinerant instruction) **to be provided in conjunction with regular class placement.**" (34 C.F.R. §300.115 (emphasis added)). In interpreting IDEA's LRE mandate and call for necessary supplementary aids and services, the U. S. Department of Education, Office of Special Education Programs, has said:

> [B]efore a disabled child can be placed outside the regular educational environment, the full range of supplementary aids and services that could be provided to facilitate the student's placement **in the regular classroom setting must be considered.**

<u>Letter to Hall</u>, 30 IDELR 142 (1997).

17. So strong is the least restrictive environment requirement that federal funding to states, like TDOE, is predicated upon bringing children with disabilities back to their non-disabled peers. Before accepting federal money, Tennessee must have:

> [P]rocedures to assure that, to the **maximum extent appropriate**, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, **and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.**

7

42 U.S.C. 1412(5) (emphasis added); *Bd of Educ v. Rowley*, 102 U.S. 176, n. 24 (1982).

18. Finally, thirty years after passage of the IDEA in the 1970s, Congress returned to the importance of general education for children with disabilities. Writing "Congress finds" into the 2004 Reauthorization of the IDEA, the law now states:

> Congress finds the following:
>
> Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by
>
> (A) having high expectations for such children and ensuring their **access to the general education curriculum in the regular classroom, to the maximum extent possible**;
>
> (C) … children [will] benefit from such efforts and that special education can become a **service for such children rather than a place where such children are sent**; and
>
> **(D) providing appropriate special education and related services, and aids and supports in the regular classroom, to such children, whenever appropriate.**

20 U.S.C. §1400(c)(5)(emphases added)

19. Moreover, under IDEA Regulations: "A State must not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability FAPE according to the unique needs of the child, as described in the child's IEP." 34 C.F.R. §300.114(b)(i-ii)(2011). In 2004, TDOE was instructed to revise its funding mechanisms to ensure students with disabilities are included in

8

the regular education environment to the maximum extent appropriate. 20 U.S.C. §1412(a)(5)(2011).

### A.     W.H.

20.    W.H. has a "disability" which qualifies him for special education under the IDEA. KCS determined that W.H. is eligible under the IDEA due to autism (a pervasive developmental disorder) and his need for special education. Therefore, W.H. has an Individualized Education Plan (IEP). W.H. also has a "disability" under Title II of the ADA and Section 504 of the Rehabilitation Act, as he is substantially limited in major life activities: learning, concentration, and focus.

21.    KCS has always placed W.H. in a "special class" which is *not* his least restrictive environment. Supplementary aids and services *to enable participation in regular education* have never been appropriately considered for W.H., dating back to the age of three. In this class, KCS will "love on the kids," and teach basic tasks or skills, but, in reality, and longitudinally, KCS is depriving W.H. of the thirty years of research and the Congressional demand for "high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible."

### B.     J.A.

22.    J.A., too, has a "disability" which qualifies him for special education under the IDEA. KCS determined that J.A. is eligible under the IDEA due to autism (a pervasive developmental disorder) and his need for special education. Therefore, J.A. has an Individualized Education Plan (IEP). J.A. also has a

"disability" under Title II of the ADA and Section 504 of the Rehabilitation Act, as he is substantially limited in major life activities: learning, concentration, and focus.

23. J.A., since age three, was placed in a separate classroom ("Comprehensive Development Classes," or CDC) from pre-K through second grade. J.A. attended five schools of separate classrooms prior to second grade. In second grade, Ball Camp Elementary, his zoned school, instituted its own CDC program and KCS placed J.A. inside that classroom.

24. Frustrated with five years of separate schooling, J.A's mother obtained a master's degree in Inclusive Education and Curriculum (application of Least Restrictive Environment principles in the public school setting). Eventually, by third grade, J.A. was reduced from 35 hours of CDC to 10 hours of CDC (a 72% reduction due to effective advocacy over nine weeks). And he succeeded. But even now, despite this success, J.A. is still "pulled out" for a portion of each day to a CDC special classroom.[2]

---

[2] This separate class is historically referred to by KCS as "Comprehensive Development Class (CDC)," but now re-branded as "Small Group Instruction," as if it can simultaneously be on both ends of the special education continuum (a special / separate class *and* resource). When the parents brought this to the attention of the Knox County school board in September of 2015, KCS responded: "*By law,* he is a resource student. Now, Knox County students are now grouped according to small group. So, kids that are alike-- just like reading groups are children reading at like level-- special ed students are grouped according to alike. And so they are taught by a special ed teacher. So his service of the special ed is not in the location. He is a resource student taught by a special ed teacher."

10

### C.   J.B.

25.     J.B., likewise, has a "disability" which qualifies him for special education under the IDEA.[3] KCS determined that J.B. is eligible under the IDEA due to a "developmental delay" and his need for special education. Therefore, J.B. has an Individualized Education Plan. (IEP). J.B. also has a "disability" under Title II of the ADA and Section 504 of the Rehabilitation Act, as he is substantially limited in major life activities of adaptive functioning and social functioning.

26.     Since November of 2014, J.B. has continually been denied appropriate consideration in his least restrictive preschool setting. As a high-performing student who only narrowly qualified for eligibility under the IDEA criteria for developmental delay in November 2014, KCS nevertheless utilized "separate" or "special" classes for him—Pre-K with direct specialized instruction from a special education teacher. He was never even considered for Governor's Pre-K.[4] As with W.H. and J.A., J.B. was a victim of the culture and funding-pattern of more restrictive environment, explained further below.

---

[3]     At times relevant hereto, J.B. was a preschooler. The least restrictive environment (LRE) requirements in section 612(a)(5) of the IDEA apply to the placement of preschool children with disabilities. This applies from age three to five. So, too, do the requirements of Section 504 and Title II of the IDEA.

[4]     Only now, in 2015 through advocacy, has KCS recognized that J.B. can receive FAPE in a least restrictive environment of general education.

11

### D. The More Restrictive Environment (the Pattern and Funding)

27. TDOE publicly endorses principles of least restrictive environment. In fact, it publishes a very detailed Special Education Manual which addresses least restrictive environment. However, it does not provide (or KCS does not attend) adequate training—much of its special education personnel are generally unfamiliar with the Manual.

28. While publicly endorsing least restrictive environment principles, TDOE utilizes what is known as "resource-based funding" as its special education funding formula. Under this model, TDOE funds KCS through ten (10) student placement "options."

29. These options are as follows: 1 (Consultation);[5] 2 (Direct Services);[6] 3 (Direct Services);[7] 4 (Direct Services);[8] 5 (Direct Services);[9] 6 (Ancillary Services);[10] 7

---

[5] Minimum of 2 contacts per month, except OT/PT. Direct Services equal less than 1 hour per week. Related Services equal less than 1 hour per week.

[6] Direct Services more than or equal to 1, but less than 4 hours per week; or any one Related Service more than or equal to 1, but less than 4 hours per week.

[7] Direct Services more than or equal to 4, but less than 9 hours per week; or any one Related Service more than or equal to 4, but less than 9 hours per week.

[8] Direct Services more than or equal to 9, but less than 14 hours per week; or any one Related Service more than or equal to 9, but less than 14 hours per week.

[9] Direct Services more than or equal to 14, but less than 23 hours per week; or any one Related Service more than or equal to 14, but less than 23 hours per week.

[10] Attendant provided so that the student can have at least 4 hours per day in less restrictive and general education settings.

(Direct Services);[11] 8 (Self Contained or CDC).[12] These options are critical because they determine the level of funding provided to KCS.

30. The mechanism by which TDOE allocates funds to KCS for qualifying students with a disability is outlined in the 2004 "Tennessee Options of Service Calculation using the Easy IEP® SSMS Module." The EASY IEP SSMS Module is the software utilized by KCS to develop a student's Individualized Education Plan (IEP).

31. Under TDOE's funding formula, if KCS places a student in a more restrictive environment, not a less restrictive environment, KCS receives more dollars from TDOE. KCS, in turn, is accepting these financial incentives rather than educating children with pervasive disabilities, like the plaintiffs, in the least restrictive environment *through* "Supplemental Aids, Services and Supports."

32. In practice at KCS, persons like W.H. and J.B. and J.A., who can derive meaningful educational benefit in the *regular education classroom* through quantifiable services, including but not limited to Resource Room or a Classroom Instructional Aide, are not given that consideration.[13] Instead, they are placed in more restrictive environments than necessary.

---

[11] Special Education services 23 or more hours per week; or, any one Related Service 23 or more hours per week.

[12] The sum of all direct services plus related services listed below plus up to 10 hours per week of special education educational assistant in the general program equals 32.5 or more hours per week. In addition, at least two Related Services from those specific below must be received for at least the minimum times listed.

[13] This case is focused on pervasive developmental disorders, not "Specific Learning Disabilities" for which Resource rooms *are* provided.

13

33. When parents participate in an IEP meeting, KCS's special education personnel use the "Easy IEP" software to create a draft. That draft is almost always presented at the beginning of the IEP meeting. While a draft IEP is not illegal *per se,* this has become the "cue," the "crutch," or "game plan," to the point that teachers do not actually engage in much collaboration about any supplements which actually might assist a child *in the general classroom*. Often, as in the case of J.B. and others, the section of the IEP called "Supplementary Aids/Services and Support for the child" is completed with the notation "NA," for "not applicable."

34. The makers of Easy IEP contemplate that "Supplementary Aids/Services and Support for the child" *will* be addressed in the context of the regular education classroom. Again, the Easy IEP software contains a black, bolded box for the IEP team to input such supports in this context: **"Supplementary Aids/Services and Support for the Child."** This is to occur in tandem with a discussion about general education.

35. Children with a pervasive disability like W.H. or J.B. or J.A. may need Supplementary Aids/Services and Supports such as a <u>classroom aide</u>, <u>itinerant instruction</u>, or <u>Resource Room</u>. However, if KCS were to address Supplementary Aids/Services and Services in the general education setting, it would not trigger any funding through the Options of Service Calculation system used by the TDOE.

36. In order to get the funding, KCS delays and/or dismisses consideration of <u>classroom aide</u>, <u>itinerant instruction</u>, or <u>Resource Room</u> except as part of "Direct Special Education or Related Services." The result is that the needed services are

14

typically misapplied to a more restrictive placement, not the least restrictive environment.[14]

37. Consistently, KCS tags Supplementary Aids/Services and Supports *through* "Direct Special Education" and "Related Services." This, in turn, habitually forces the child with pervasive disabilities (W.H. and J.B. and J.A.) out of general education environment and into a "separate class." It triggers funding, but not in the least restrictive environment. As a result, W.H., J.B., and J.A., and persons like them, are misled by KCS (and TDOE) into believing that appropriate supplementary supports in conjunction with regular class placement (the *least restrictive environment*) are not possible. And over time, these children fall farther behind or have difficulty catching up.

38. As referenced above, W.H. continually has been placed in a separate class. J.A. was schooled separately from age three, and to a lesser extent, even now. And J.B., a preschooler whose initial IEP development did not allow consideration of anything but a segregated preschool setting, was never considered for a less restrictive environment such as the public Governor's Pre-school program prior to turning four years old.[15]

---

[14] The issue is both technical and important. "Resource" is a "supplementary" service to general education and it is a "setting." CDC is also a "setting," but it is more restrictive because it is a "special class," a direct service, and not a supplemental service. KCS does not make this distinction for supplementary services, choosing to use "direct special education or related services" only.

[15] "The Governor's Program" refers to Tennessee's Voluntary Pre-K Program designed to prepare children for success in kindergarten.

15

39. Unfortunately, KCS is buoyed in this approach by lack of training <u>and</u> receiving financial incentives from TDOE. The necessary supports are only viewed through the lens of being "direct" and "related." This results in separate or special classes, not supplements *in conjunction with regular education*. Nonetheless, TDOE is advising the federal government that least restrictive principles *are* being met for children with pervasive disabilities when, in fact, they are not. These Plaintiffs are examples.

40. For children with pervasive disabilities like these Plaintiffs, KCS is knowingly taking these actions not in the individual best interest of the child's *least restrictive environment* with help from a <u>classroom aide</u>, <u>itinerant instruction</u>, or <u>Resource Room</u>. In fact, in September of 2015, J.A.'s father, M.B., met with the school board and publicly explained the problem to no avail.

41. When it comes to children like W.H. and J.B. and J.A. with pervasive disabilities, KCS is effectuating more restrictive environments than necessary for purpose of obtaining money from TDOE. In fact, upon information and belief, TDOE's State Director of Special Education has admitted the following:

> It is our intent to develop a funding structure that incents districts to improve student outcomes including educating students with disabilities in the LRE and where appropriate, providing intervention for students at risk of being referred to special education. TN currently funds school districts through student placement options (resource-based). There are 10 options in the state's basic education program for funding. **Based on options, Students with Disabilities in more restrictive environments generate more state dollars for the LEA**; however, in TN, we believe that students need more access in the general education environment for core content.

16

Case 3:15-cv-01014   Document 4   Filed 09/30/15   Page 16 of 19 PageID #: 36

42. The Director is correct. W.H., J.B., and J.A. are the victims of TDOE and KCS's knowledge of the problem, but continued failure to fix the problem (i.e., deliberate indifference). Defendants' use of options to generate more state dollars for the LEA through "more restrictive environments," not least restrictive environments, thereby violates federal laws.

43. For even further illustration, KCS will choose the more restrictive Option 7 or Option 8, "developmental or special class," for these supplements, rather than choosing the less restrictive Option 6, "ancillary services" to provide the needed supports such as instructional aid in the regular classroom for the majority of the day. The reason ultimately boils down to dollars: For Options 7 and 8, KCS receives more cost effective funding (more students are served by funding a teacher in the segregated setting) whereas for admittedly higher funded Option 6, KCS would be required to document a ½ Full Time Equivalent in its budget, thereby creating a financial burden.

44. As a result of these systemic problems with LRE, KCS has ranked last among all Tennessee school districts in Least Restrictive Environment indicators.

## IV. LEGAL CLAIMS

45. The foregoing facts are incorporated.

46. Plaintiffs bring the following legal claims against TDOE and Knox County Schools:

> A. **IDEA**. Violation of IDEA and Section 504 for accepting federal funds premised upon Least Restrictive Environment while encouraging

17

and implementing unnecessarily (more) restrictive environments for W.H., J.A., J.B., and persons like them.

      **B.**    **Section 504 and Title II of the ADAAA.**   TDOE and KCS have *unnecessarily* served W.H., J.A. and J.B. in a more segregated environment than is necessary, violating requirements of integration and reasonable modification.[16]

**WHEREFORE, premises considered, Plaintiffs** requests appropriate injunctive and equitable relief, appropriate funding to enable consideration of least restrictive environment, appropriate supplemental aids, services and supports for W.H., J.A., and J.B., appropriate make whole relief for the too-restrictive environments, damages under 504 and the ADA for deliberately subjecting W.H., J.A., and J.B. to a more restrictive environment than necessary, and for any further relief to which they are entitled, along with all attorneys fees and costs.

---

[16] Title II regulations provides that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §13.130(d)(2011). Similarly, Section 504 states that "Recipients [must] administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. §41.51(d)(2011).

18

Case 3:15-cv-01014 Document 4 Filed 09/30/15 Page 18 of 19 PageID #: 38

Respectfully Submitted,

**GILBERT RUSSELL McWHERTER SCOTT BOBBITT, PLC**

/Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 504
Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document was served upon Defendants via U.S. Mail on this the 30th day of September, 2015.

KNOX COUNTY SCHOOLS
c/o Dr. James P. McIntyre, Jr., Superintendent
912 South Gay Street
Knoxville, TN 37902

TENNESSEE DEPARTMENT OF EDUCATION
c/o Robert E. Cooper, Jr., Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202

s/Justin S. Gilbert

19

Case 3:15-cv-01014  Document 4  Filed 09/30/15  Page 19 of 19 PageID #: 39