UNITED STATES DISTRICT COURT
MIDDLE DISTICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| W.H., *a minor student, by and through his parents (M.H. and D.R.)*; J.A., *a minor student, by and through his parents (S.A. and M.A.)*; and J.B., *a minor student, by and through his parents (J.B. and S.B.)*, <br><br>Plaintiffs, <br><br>v. <br><br>TENNESSEE DEPARTMENT OF EDUCATION and KNOX COUNTY SCHOOLS, <br><br>Defendants. | Case No. 3:15-1014 <br> Judge Aleta A. Trauger |

# MEMORANDUM

Pending before the court are three motions: 1) a Motion for Change of Venue filed by the defendant Knox County Schools ("KCS") (Docket No 12), to which the defendant Tennessee Department of Education ("TDOE") has filed a Response in Opposition (Docket No. 13), and the plaintiffs have also filed a Response in Opposition (Docket No. 18); 2) a Motion to Dismiss filed by TDOE (Docket No. 16), to which the plaintiffs have filed a Response in Opposition (Docket No. 20), and TDOE has filed a Reply (Docket No. 25); and 3) a Motion to Dismiss by KCS (Docket No. 28), to which the plaintiffs have filed a Response in Opposition (Docket No. 29). For the reasons discussed herein, the motions will be denied.

# BACKGROUND & PROCEDURAL HISTORY

The plaintiffs are minors who reside in Knox County, Tennessee and attend public primary schools that are within the KCS system and overseen by TDOE. Each of the plaintiffs has a pervasive disability that entitles him or her to specialized educational services under the

federal Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. (the "IDEA"), including a free appropriate public education ("FAPE"), an individualized education program ("IEP"), and placement in the least restrictive environment ("LRE"). 20 U.S.C. § 1412. These rights are also guaranteed under Tennessee law. Tenn. Comp. R. & Reg § 0520-01-09 (adopting by reference the federal regulations contained in 34 C.F.R. §§ 300-301). The LRE is defined as follows: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The IDEA further provides that "[a] State funding mechanism shall not result in placements that violate the [LRE requirements], and a State shall not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability a free appropriate public education according to the unique needs of the child as described in the child's IEP." 20 U.S.C. § 1412(a)(5)(B).

On September 21, 2015, the plaintiffs commenced this action against KCS and TDOE (Docket No. 1) and, on September 30, 2015, the plaintiffs filed an Amended Complaint, which is the current operative pleading (the "Complaint") (Docket No. 4). The Complaint raises causes of action under three separate federal statutes: 1) the IDEA; 2) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("Title II"); and 3) Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794 ("Section 504").

The gravamen of the Complaint is that the plaintiffs – along with other KCS students with disabilities – have been denied LRE placements and placed "in more segregated settings than necessary, often in highly segregated 'separate' schools" (Docket No. 4, p.4) due to the following systemic practices by the defendants: 1) TDOE's protocol for allocating funding to KCS (and other local educational agencies), for the education of students with disabilities, provides financial incentives to KCS to place students with disabilities in more restrictive environments than necessary, in violation of the IDEA's LRE requirement; 2) KCS, in order to benefit from these funding incentives and due to prevailing bias in favor of more restrictive environments, routinely funnels students with disabilities into more restrictive environments than necessary, rather than considering alternative options such as supplemental services in a general education classroom, again in violation of the LRE requirement; and 3) KCS utilizes software to develop IEPs for students with disabilities in a way that misleads students and parents into believing that less restrictive placement options are not available when, in fact, they are. The Complaint further alleges that TDOE is aware that its current funding structure provides financial incentives that cut against its federally mandated objective of ensuring LRE placements for children with disabilities but has failed to take any measures to change these practices.

The Complaint seeks the following relief: 1) injunctive relief, seemingly to enjoin the defendants from continuing practices that prevent proper consideration of LRE placements for students with disabilities; 2) damages under Section 504 and Title II related to prior denials of LRE placements for the plaintiffs, based on these practices; and 3) attorneys' fees and costs.

On October 19, 2015, KCS filed a Motion to Dismiss and For Change of Venue (Docket No. 12), which 1) sought dismissal under Rule 12(b)(1) for the alleged naming of improper parties and insufficient service of process, and 2) sought to transfer the action to the United

States District Court for the Eastern District of Tennessee under 28 U.S.C. § 1404(a). On the same day, TDOE filed a Response in Opposition to KCS' Motion to Change Venue. (Docket No. 13.)

On October 26, 2015, TDOE filed its own Motion to Dismiss (Docket No. 16) along with a Memorandum in Support (Docket No. 17), arguing: 1) that all claims against TDOE should be dismissed due to the plaintiffs' failure to administratively exhaust the claims, as required by 20 USC § 1415 of the IDEA; 2) that the Title II and Section 504 claims against TDOE should be dismissed under 12(b)(6) for failure to state a claim; and 3) that the Title II claim for monetary damages against TDOE should be dismissed under Rule 12(b)(1) due to lack of subject matter jurisdiction because TDOE is entitled to Eleventh Amendment immunity with respect to that claim.

On November 2, 2015, the plaintiffs filed a Response to KCS's Motion to Dismiss And For Change of Venue. (Docket No. 18.) On November 5, 2015, the plaintiffs filed a Response in Opposition to TDOE's Motion to Dismiss. (Docket No. 20.)

On November 6, 2014, pursuant to the parties' stipulation, the court denied as moot KCS's first Motion to Dismiss – the motion arguing that there were improper parties and insufficient service of process – but reserved judgment on KCS's Motion for Change of Venue, which was brought in the same filing. (Docket No. 21.)

On December 22, 2015, KCS filed a second Motion to Dismiss, this time echoing two of the legal grounds raised in TDOE's pending Motion to Dismiss – 1) failure to exhaust administrative remedies under the IDEA and 2) failure to state a claim with respect to the Section 504 and Title II claims – and incorporating by reference the TDOE's arguments contained therein. (Docket No. 28.)

4

On December 23, 2015, the plaintiffs filed a Response to KCS' Motion to Dismiss. (Docket No. 29.)

## ANALYSIS

I. **Motion for Change of Venue**

Under 28 U.S.C. § 1404(a), "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." With this statute, "Congress intended to give district courts the discretion to transfer cases on an individual basis by considering convenience and fairness." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 537 (6th Cir. 2002). In ruling on a motion to transfer venue, a district court should consider case-specific factors, such as "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir. 2006) (quoting *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1136-37 (6th Cir. 1991)); accord *Kerobo*, 285 F.3d at 557.

The Sixth Circuit has suggested that relevant factors to consider include: 1) the convenience of the parties and witnesses; 2) the accessibility of evidence; 3) the availability of process to make reluctant witnesses testify; 4) the costs of obtaining willing witnesses; 5) the practical problems of trying the case most expeditiously and inexpensively; and 6) the interests of justice. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). The moving party bears the burden of establishing that these factors weigh in favor of transferring venue. *See, e.g., Picker Int'l, Inc. v. Travelers Indem. Co.*, 35 F. Supp. 2d 570, 573; *Blane v. Am. Inventors Corp.*,

5

934 F. Supp. 903, 097 (M.D. Tenn. 1996). Ordinarily, "unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reese*, 574 F.3d at 320 (quoting *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 612 (6th Cir. 1984)) (emphasis added).

KCS' motion for transfer of venue is premised, initially, on its argument that, because the plaintiffs do not reside within the Middle District of Tennessee, the court should not defer to their choice of forum. KCS is correct that, when plaintiffs do not reside in their chosen forum, their choice should be given less weight than would otherwise be the case. The court notes, however, that KCS has cited cases where there was no connection whatsoever between the action and the plaintiff's choice of forum as illustrations of situations where the plaintiff's choice of forum was successfully outweighed by other interests. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) (affirming dismissal on *forum non conveniens* grounds where the plaintiff was not a resident of the forum, "nor did any event connected with the case take place there, nor does any witness with the possible exception of experts live there."); *Kay v. Nat'l City Mortg. Co.*, 494 F. Supp. 2d 845, 852 (S.D. Ohio) ("On the whole, the factors identified by Plaintiff do not demonstrate a connection with this matter to Ohio."); *Ozark Entm't, Inc. v. Wilson*, No. 3:09-cv-0195, 2009 WL 4884445, at *2 (M.D. Tenn. Dec. 10, 2009) ("The court finds that although the Plaintiffs' choice of forum carries significant weight, the fact that there is no (or, at most, a very limited) connection to this forum requires that Plaintiffs' choice be given diminished weight.").

In this action, on the other hand, there is a significant connection to the Middle District of Tennessee, as one of the defendants and many of the potential witnesses are located here, and at least some of the events giving rise to the action took place here. Moreover, although the court may give slightly *less* weight to the plaintiffs' choice of forum because the plaintiffs do not

reside here, this does not mean that the plaintiffs' choice should be given *no* weight; nor does it negate the defendant's burden to demonstrate that other factors weigh in favor of transfer. *See Ajose v. Interline Brands, Inc.*, No. 3:14-cv-1797, 2015 WL 5773080, at *3 (M.D. Tenn. Sept. 30, 2015) ("Perhaps Defendant's most compelling argument is that the Plaintiffs' forum choice should receive deference because Plaintiffs have no ties to the Middle District of Tennessee. . . . Yet the absence of deference does not alone defeat the Plaintiffs' forum choice; Defendant still bears the burden on a Section 1404(a) motion.").

KCS has asked this court to transfer venue to the Eastern District of Tennessee, but – even putting aside the deference due to the plaintiffs' choice of forum – KCS has failed to meet its burden of showing that the balance of the factors weighs in favor of such transfer. As an initial matter, not only is the Middle District of Tennessee the plaintiffs' choice of forum, it is also the preferred forum of TDOE. Of the three parties to this matter, then, it is only one party that favors the Eastern District of Tennessee over the Middle District. Further, while KCS has correctly pointed out that a significant portion of the events giving rise to this action took place in Knox County, where the plaintiffs reside and attend school (namely, actions related to developing the plaintiffs' IEPs and determining their educational placements), still other events giving rise to this action appear to have taken place in Nashville (namely, actions related to setting TDOE's funding policies). Not only is TDOE primarily located in Nashville, the state capital, but it appears that TDOE officials working out of the Nashville office are responsible for setting the TDOE funding structure that is challenged as a central issue in this case. Accordingly, considering the location of events giving rise to the action, as well as convenience of all parties, there are factors weighing in favor of both the Middle District and the Eastern District, but there is not a tipping of the scales in favor of the Eastern District.

KCS' strongest argument in favor of transfer to the Eastern District involves the convenience of non-party witnesses located in Knox County and the ability of the court to reach these witnesses by subpoena. KCS has not, however, actually named any particular witnesses or alleged any specific facts to support the argument that any necessary witness to the action would be unreasonably inconvenienced by having to attend trial in the Middle District or would be outside of the court's subpoena power. KCS has only raised the general argument that witnesses will include board members, administrators, and other employees of KCS, all of whom are located in Knox County. The court recognizes that it is highly likely that KCS agents will be called as witnesses in this action and the court also acknowledges that it would likely be more convenient for them to testify in court in the Eastern District than the Middle District. However, KCS has not offered any evidence, aside from the distance between Knox County and Nashville, to show that this inconvenience would be so substantial or significant as to tip the scales in favor of relocating the locus of this lawsuit.

Knox County is only a three hour drive from Nashville and is within the state. Moreover, under Rule 45, these witnesses – who are employees of a party to the action – are likely subject to the subpoena power of this court, as it is within the state of Tennessee, where they are employed. *See* Fed. R. Civ. P. 45(c)(1)(B) ("A subpoena may command a person to attend a trial, hearing, or deposition . . . within the state where the person resides, is employed, or regularly transacts business in person, if the person is a party or a party's officer; or is commanded to attend a trial and would not incur substantial expense.") KCS has certainly provided no evidence to the contrary, including any evidence of substantial expense for potential witnesses who are not officers of KCS, and the mere inconvenience associated with calling these individuals to Nashville to testify is not sufficient to outweigh the other factors in favor of

8

keeping the case in the Middle District. Accordingly, KCS' request to transfer venue will be denied.

**II.     Motions to Dismiss**

There are two Motions to Dismiss pending before the court, which raise overlapping issues. Both defendants argue that all claims against them should be dismissed for failure to exhaust under the IDEA and that, in the alternative, the Section 504 and Title II claims against them should be dismissed for failure to state a claim under Rule 12(b)(6). TDOE additionally argues that the claims against TDOE for monetary damages under Title II should be dismissed on the grounds of Eleventh Amendment immunity for state defendants. The court will address each of these arguments in turn.

   **A. Exhaustion**

Under the IDEA, state educational agencies – such as TDOE – are required to provide administrative impartial due process hearings for students challenging any matter relating to their receipt of a FAPE, including placements in alternative educational settings and LRE requirements. 20 U.S.C. § 1415(b)(6)(f)-(g); 20 U.S.C. § 1415(b)(6)(k). While the IDEA provides for a private right of action for these matters as well, it requires that plaintiffs first exhaust the administrative procedures. 20 U.S.C. § 1415(i); *see also S.E. v. Grant Cnty Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008). The Sixth Circuit has held that the rationale behind this exhaustion requirement is that "the IDEA gives the 'primary responsibility . . . for choosing the education method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child.' The federal courts are not the entities best equipped to craft an IEP or remedial substitutes. They are, instead, suited to reviewing detailed administrative records, such as those that would be furnished through due

9

process hearings . . . under the IDEA." *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 433-34 (6th Cir. 2006) (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 (1982))*; see also Frye v. Napoleon Cmty. Schs.*, 788 F.3d 622, 626 (6th Cir. 2015) (holding that the IDEA "calls for a highly fact-intensive analysis of a child's disability and her school's ability to accommodate her" and that the administrative exhaustion procedures "ensure that the child's parents and educators, as well as local experts, are first in line to conduct this analysis").

The exhaustion requirement for claims brought under the IDEA applies with equal force to claims brought under Section 504 and Title II that arise from the same misconduct that allegedly violates the IDEA. 20 U.S.C. § 1415(l) ("Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subjections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.") (emphasis added) (internal citations omitted); *see also Frye*, 788 F.3d at 625.

Administrative exhaustion of these claims, however, is not required "when it would be futile or inadequate to protect the plaintiff's rights." *Donoho ex rel. Kemp v. Smith Cnty. Bd. of Educ.*, 21 F. App'x 293 (6th Cir. 2001) (citing *Covington v. Knox Cnty. Sch. Sys.*, 303 F.3d 912, 915 (6th Cir. 2000); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir.1989)); *see also Honig v. Doe*, 484 U.S. 305 (1988) (holding that a claim under the

predecessor statute to the IDEA could proceed in federal court without prior administrative exhaustion where such exhaustion would be futile).

While the court is not aware of a Sixth Circuit case that explicitly defines futility in this context, or one that specifically holds that requiring the administrative exhaustion of a claim challenging systemic practices would be futile, the court finds that it would clearly be futile for the plaintiffs in this action to attempt to exhaust their particular claims regarding the defendants' systemic practices through state administrative procedures. First, the state is a defendant in this action and has an interest in upholding, rather than changing, its current practices. Moreover, the express purpose behind the administrative exhaustion requirement – the ability to review educational placements at the local level – does not apply to the issues in this action. The plaintiffs are not asking the court to conduct a thorough review of all aspects of the plaintiffs' educational needs. Rather, they are raising the very pointed question of whether – in meeting those needs – particular systemic practices, namely the promulgation and consideration of improper financial incentives within the framework of allocating state funding for the plaintiffs' education, caused the plaintiffs to be placed in more restrictive environments than necessary, contrary to federally mandated LRE requirements.[1] The plaintiffs are challenging practices that occur across the school district and the state at a meta-level, practices that are removed from the local-level evaluation of students' actual abilities and determination of services needed. The

---

[1] The court notes, significantly, that the plaintiffs do not appear to argue that they should be placed in the best possible educational environment, irrespective of resources and budgeting issues. Instead, they argue that, to the extent TDOE is providing funding to KCS that has been allocated for the plaintiffs' education, it should be used to make the LRE placement within the range of available options, given these other constraints, and students with disabilities should not be placed in more restrictive environments than necessary simply to reap a financial gain for KCS.

court does not require a full administrative record regarding the plaintiffs' disabilities and recommended services – matters that do not appear to be at issue in this action – in order to answer this question. This is different from the kinds of claims at issue in the cases cited above, in which the Sixth Circuit found that exhaustion was required. *See Long*, 197 F. App'x 427, 433-34 (requiring exhaustion where the complaint alleged a failure by the school district to implement the plaintiff's IEP and provide her with sufficient educational services); *Frye* (requiring exhaustion where the plaintiff was challenging an individualized decision forbidding her to bring her service dog to school).

In addition, the Second Circuit has held that challenges to systemic practices – like the claims at issue here – are not subject to the IDEA's exhaustion requirement. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 114-15 (2d Cir. 2004) (acknowledging "the importance of exhaustion in 'textbook' cases presenting issues involving individual children where the remedy is best left to educational experts operating within the framework of the local and state review procedures" but holding that exhaustion was not required because the claims did not challenge the content of the individual IEP but, instead, challenged the school district's failure to prepare and implement IEPs on a wide-scale basis along with other systemic oversights involving proper notifications to parents and training of staff). The Second Circuit declined to require state administrative exhaustion in *J.S. ex rel. N.S.*, even though the state agency itself was not named as a defendant but only the local agency was. In the instant action, where the state agency is also a defendant and its practices are expressly at issue, there is even more reason to find that state administrative exhaustion would be futile. The court is swayed by the logic of the Second Circuit and the facts of this case to find that exhaustion should not be required here.

The defendants argue that the plaintiffs should be required to exhaust because they are seeking only relief that pertains to the individual educational placements of the plaintiffs themselves, which is exactly the type of relief anticipated by the IDEA-mandated state administrative proceedings. This reading of the plaintiffs' claims, however, is simply not consistent with the Complaint itself. While it is true that the monetary damages sought by the plaintiffs relate only to their individual placements, the injunctive relief they seek includes changes to systemic practices that would potentially have an impact on students with disabilities throughout KCS, as well as the state of Tennessee, including: 1) mandatory changes to the TDOE funding structure to eliminate financial incentives that undermine LRE placements; 2) the enjoining of KCS from considering improper financial incentives in making placement determinations or placing children with disabilities in more restrictive environments than necessary solely for the purpose of diverting funds allocated for children with disabilities to other areas; and/or 3) changes to KCS' process for developing IEPs that would ensure that the availability of LRE placement options are appropriately understood and considered by families of children with disabilities and others participating in the decision-making process.

For these reasons the court will not require the plaintiffs to exhaust administrative procedures before proceeding with their claims and will not dismiss any of the claims on this ground.

### B. Failure to State a Claim Under Title II and Section 504

The defendants argue, in the alternative, that the plaintiffs' claims under Title II and Section 504 should be dismissed under Rule 12(b)(6) because the plaintiffs have failed to adequately plead all elements of these claims.

### *1. Legal Standard Under Rule 12(b)(6)*

13

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### 2. *Application to Title II and Section 504 Claims*

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . [.] . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .". Title II is nearly identical, with the exception of

14

covering even public services that are not funded by federal financial assistance. 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." As discussed above, the IDEA expressly provides that plaintiffs may bring a private right of action for denial of a FAPE under Title II and Section 504, as well as under the IDEA itself. 20 U.S.C. § 1415(i); *see also Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 166 (6th Cir. 2003) ("Generally, the [IDEA], as amended 20 U.S.C. §§ 1400-20, informs a Rehabilitation Act discrimination claim which is buttressed by allegations that a public school district failed to appropriately accommodate a handicapped student's extraordinary educational needs.").

The Sixth Circuit has held, however, that in order to succeed on a Section 504 claim in this context, "more harm is required than a denial of [FAPE]." *N.L. ex rel. Mrs. C. v. KCS Cnty Schools*, 315 F.3d 688, 695 (6th Cir. 2003). In particular, the Sixth Circuit has held that, in addition to proving the denial of a FAPE under the IDEA, "the Rehabilitation Act *further requires* that the [plaintiff] must ultimately prove that the defendant's failure to provide [the plaintiff] with a [FAPE] was *discriminatory*. Surmounting that evidentiary hurdle requires that either *bad faith or gross misjudgment* must be shown before a 504 violation can be made out, at least in the context of the education of handicapped children." *Campbell*, 58 F. App'x at 167(emphases added) (internal citations omitted); *see also Hill v. Bradley Cnty Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008) (holding that there was no Section 504 violation where there was no allegation of "deliberate indifference," which the court defined as "more than a collection of sloppy, or even reckless, oversights"). The Sixth Circuit has expressly held that this element of discriminatory intent applies as well to Title II claims in the education context and that

15

"'[a]part from [Section 504's] limitation to denials of benefits "solely" by reason of disability and its reach of only federally funded – as opposed to "public" – entities, the reach and requirements of both statutes are precisely the same." *S.S. v. Eastern Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n. 6 (2d Cir. 2002).

The defendants argue that the plaintiffs have pled only the elements of an IDEA claim, and not pled violations of Section 504 or Title II, by alleging that the defendants have failed to provide them with a FAPE through required LRE placements. According to the defendants, the plaintiffs have not alleged anything related to the additional element of discriminatory intent necessary to plead a Section 504 or Title II claim. The court disagrees with this overly narrow reading of the Complaint. By alleging that TDOE and KCS have implemented the systemic practices named in the Complaint, despite being aware of their adverse impact on the ability of students with disabilities to receive the LRE placements to which they are entitled, the plaintiffs have certainly provided sufficient allegations to support an inference of discriminatory intent that would allow these claims to proceed. The implications of the Complaint allow for the possible inference that KCS intentionally places children in more restrictive environments on order to use TDOE funding that should be allocated for students with disabilities and redirects it toward other funding goals, ostensibly discriminating against students with disabilities in favor of non-disabled students, and that TDOE – knowing of the issue – either encourages this or grossly overlooks it. Although the plaintiffs concede that the primary intention of TDOE's resource-based funding structure is to "promote equity in funding, providing more funding for greater costs" (Docket No. 20, p. 6 n.5), this does not undermine the plaintiffs' allegations that TDOE knowingly executes this funding structure in a manner that provides improper incentives for

local agencies to deny students with disabilities their federal right to an LRE placement. The element of discriminatory intent, as laid out by the Sixth Circuit, does not require malice by TDOE, or a subjective intent to harm students with disabilities, but only a gross misjudgment that has a discriminatory effect. Whether such misjudgment has occurred is a question that should be left to the trier of fact to determine.

It is clear that the plaintiffs may have a difficult burden to actually prove this additional element of discriminatory intent to a trier of fact, but it is equally clear that the plaintiffs have put forth enough of a foundation in the Complaint that they should have the opportunity to further develop the record and proceed with these causes of action. Accordingly, the court will not dismiss the Title II or Section 504 claims under Rule 12(b)(6).

### C. TDOE's Eleventh Amendment Immunity Under Title II

Lastly, TDOE argues that the plaintiffs' claim for monetary damages under Title II should be dismissed because TDOE is entitled to Eleventh Amendment immunity for this claim. As a practical matter, this argument is likely of little import, since the plaintiffs would, in any case, be entitled to the same monetary damages under Section 504, and any claim for damages under Title II would be duplicative.[2]

With respect to state immunity under Title II, the ADA provides as follows:

> A state shall not be immune under the eleventh amendment to the Constitution of
> the United States from an action in Federal or State court of competent

---

[2] The Sixth Circuit has held – without even reaching the constitutionality of Congress' abrogation of Eleventh Immunity for Section 504 claims (42 U.S.C. 2000d-7(a)(2) – that immunity does not apply Section 504 because a violation of this statute requires a state defendant to have received federal funding and, therefore, "[s]tates waive their Eleventh Amendment immunity with regard to Rehabilitation Act claims when they accept federal funds." *Nihiser v. Ohia E.P.A.*, 296 F.3d 626, 628 (6th Cir. 2001). Indeed, TDOE does not challenge the plaintiffs' right to monetary damages under Section 504.

17

> jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. The Supreme Court has held that, while this provision evidences Congressional *intent* to abrogate states' Eleventh Amendment immunity from Title II claims, the constitutionality of Congress' ability to abrogate – a power that is derived from the Fourteenth Amendment of the United States Constitution – remains an open question, and the lower courts must decide on a case-by-case basis to what extent such abrogation is constitutional and can be enforced in order to allow Title II claims against state defendants to proceed. *U.S. v. Georgia*, 546 U.S. 151, 154 (2006). In *Georgia*, the Supreme Court instructed the lower courts that any alleged misconduct that violates both Title II and a plaintiff's constitutional rights under the Fourteenth Amendment can proceed under Congressional abrogation of immunity but that courts must determine, "insofar as such misconduct violated Title II but did *not* violate the Fourteenth Amendment, whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id*. at 159 (emphasis added).

The possibility that abrogation may be enforceable with respect to claims that do not involve Fourteenth Amendment violations appears to refer to prior Supreme Court precedent explaining that, where there has been a history of constitutional violations in a particular area and Congress has enacted legislation that is congruent with, and proportional to, those violations, such legislation may be enforceable against the states, even to the extent that the legislation regulates conduct not proscribed by the Constitution. *See Tennessee v. Lane*, 541 U.S. 509 (2004). After *Georgia*, it does not appear that the Sixth Circuit has analyzed the question of whether abrogation of immunity for Title II claims is enforceable in the context of claims that do

18

not involve constitutional violations and arise in the area of public education.[3]  The circuits that have considered this question post-*Georgia*, have reached the conclusion that abrogation is valid for such claims, even where there is no Fourteenth Amendment violation at issue.  *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555 (3d Cir. 2007) (holding that immunity was abrogated with respect to a Title II claim involving a disabled student's access to a sports program at a public institution of higher education because, "as applied to education, Title II is a congruent and proportional means of preventing and remedying the unconstitutional discrimination that Congress found to exist both in education and in other areas of governmental services, many of which implicate fundamental rights"); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006) (holding that abrogation applied to a claim for failure to reasonably accommodate a disabled university student and stating that "Title II, as it applies to the class of cases implicating the right of access to public education, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment"); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) (abrogating immunity for a Title II claim involving denial of accommodations for college student with a medical condition); *Assn'n for Disabled Americans v. Fla. Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005) (holding that

---

[3] The defendants have cited the Sixth Circuit's opinion in *Carten v. Kent State Univ.* (282 F.3d 391 (6th Cir. 2002)) to argue that the Sixth Circuit has addressed this question and held that Eleventh Amendment immunity is not abrogated with respect to claims under Title II involving access to public education.  (Docket No. 25, p. 5.)  This, however, does not appear to be a fair interpretation of *Carten*, which – in addition to having been decided before *Lane* and *Georgia* – does not appear to have actually considered the exact question now before the court.  Instead, the only question before the Sixth Circuit in *Carten* was whether a right to public education is a fundamental right that is protected under the Fourteenth Amendment, which the court answered in the negative.  There was no serious consideration given to the alternate ground for abrogation to apply where Congress acted proportionally and congruently with a history of constitutional violations.

abrogation applied to a Title II claim involving denial of sign language interpreters for a college student and stating "[t]he relief available under Title II of the ADA is congruent and proportional to the injury and the means adopted to remedy the injury"); *see also Dean v. Univ. at Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 195 n. 9 (2d Cir. 2015) (declining to rule on this issue, but noting that the other circuits to do so have held that abrogation is valid).

In the absence of express guidance from the Sixth Circuit, the court is swayed by these other circuits' holdings and finds that there is no reason to differentiate the analysis with respect to the right to public *primary* education. Accordingly, even though the plaintiffs have alleged no constitutional violation, the court finds that, under *Georgia*, Section 12202 validly applies to abrogate the defendants' Eleventh Amendment immunity with respect to the plaintiffs' Title II claim for monetary damages, and this claim will not be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, KCS' Motion for Change of Venue will be denied and KCS' and TDOE's Motions to Dismiss will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

-